# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| **ALVION PROPERTIES, INC.,** | § | |
| **SHIRLEY K. MEDLEY and** | § | |
| **HAROLD M. REYNOLDS,** | § | |
| | § | **CASE NO.:** _____ |
| **PLAINTIFFS** | § | |
| | § | |
| **vs.** | § | |
| | § | **JUDGE** _____ |
| **BERND H. WEBER,** | § | |
| **RAYMONDE WEBER,** | § | |
| **CLAUDE J. CHAUVEAU,** | § | |
| **GEORGE E. HOWARD,** | § | |
| **AMERICAN GULF FINANCE CORP.,** | § | **JURY TRIAL DEMANDED** |
| **ALVION PARTNERS, LLC,** | § | |
| **WEBER, LLC,** | § | |
| **AGF REALTY SOLUTIONS, INC.,** | § | |
| **TIMEDATA CORPORATION,** | § | |
| **TIME DATA HOLDINGS, LLC,** | § | |
| | § | |
| **DEFENDANTS** | § | |

## PLAINTIFFS' ORIGINAL COMPLAINT AND JURY DEMAND

### TO THE HONORABLE UNITED STATES DISTRICT COURT:

Plaintiffs Alvion Properties, Inc. ("Alvion Properties"), Shirley K. Medley ("Medley") and Harold M. Reynolds ("Reynolds") (collectively, "Plaintiffs") complain of the actions of Defendants Bernd H. Weber ("Weber"), Raymonde Weber, Claude J. Chauveau ("Chauveau"), George E. Howard ("Howard"), American Gulf Finance Corp. ("American Gulf"), Alvion Partners, LLC ("Alvion Partners"), Weber, LLC, AGF Realty Solutions, Inc. ("AGF Realty"), TimeData Corporation and Time Data Holdings, LLC (together, "TimeData"), (collectively, "Defendants"), and respectfully show the following:

COMPLAINT AND JURY DEMAND

1

## INTRODUCTION

1.     Plaintiffs bring this case to redress Defendants' wrongful and unauthorized misappropriation and use of Alvion Properties and Alvion Properties' assets, trade name, confidential and proprietary business information (including appraisals, geology reports, mining plans, business contacts, financial information and information pertaining to Alvion Properties' financial dealings), trade secrets and goodwill for Defendants' personal benefit and to the Plaintiffs' financial detriment.  Plaintiffs seek actual damages, exemplary damages, punitive damages, attorneys' fees, litigation expenses and costs.  More important, Plaintiffs seek a temporary restraining order, preliminary injunction and/or permanent injunction against Defendants to prevent such wrongful and unauthorized actions in the future.

## JURISDICTION AND VENUE

2.     This Court has subject matter jurisdiction over Plaintiffs' claims pursuant to (i) 28 U.S.C. § 1332(a) (diversity) and (ii) 28 U.S.C. § 1367 (supplemental jurisdiction).

3.     This Court also has *in personam* jurisdiction over Defendants because Defendants were (and continue to be) members of a conspiracy and, at all relevant times, one or more Defendants committed a substantial tortious act in the Middle District of Tennessee in furtherance of the conspiracy and/or at all relevant times, one or more Defendants resided, worked, maintained citizenship, was organized and/or conducted business in the Middle District of Tennessee.

4.     At all relevant times, one or more Defendants resided, worked, maintained citizenship, was organized and/or conducted business in the Middle District of Tennessee.  A substantial part of Defendants' wrongful acts and omissions occurred in the Middle District of

Tennessee. Accordingly, venue is proper in the Middle District of Tennessee pursuant to 28 U.S.C. § 1391(b).

**PARTIES**

5.      Plaintiff Alvion Properties is a Virginia corporation with its principal place of business in Harrisburg, Illinois. Alvion Properties owns 4500+ acres of coal reserves in Virginia conservatively valued at approximately $6 billion.

6.      Plaintiff Medley is a citizen and resident of Harrisburg, Illinois.

7.      Plaintiff Reynolds is a citizen and resident of Dunlap, Tennessee.

8.      At all relevant times and continually up through and including the date this Complaint was filed, Plaintiffs Medley and Reynolds each owned fifty percent (50%) of the stock of Alvion Properties (and continue to do so).

9.      Defendant Weber is a German citizen and resident of Mississauga, Ontario. Weber formerly was the Chief Financial Officer of Plaintiff Alvion Properties. In that capacity, Weber (and his alter ego Defendant companies) had unrestricted access to Alvion Properties' assets, trade name, confidential and proprietary business information (including appraisals, geology reports, mining plans, business contacts, financial information and information pertaining to Alvion Properties' financial dealings), trade secrets and goodwill. Weber also owned, managed, operated and treated Defendants American Gulf, Alvion Partners, Weber, LLC and AGF Realty as his personal bank accounts (and continues to do so) in such a way that these entities are his alter egos because in such entities, corporate formalities are not followed, separate and distinct books and records are not maintained and/or the entities are undercapitalized. On information and belief, Weber may be served with Summons and a copy of the Complaint by serving him at 5230 Hickory Park Drive, Suite A, Glen Allen, Virginia 23059, his principal place

of business, or 55 Kingsbridge Garden Circle, Suite 702, Mississauga, Ontario Canada L5R 1Y1, his principal residence.

10. Defendant Raymonde Weber, on information and belief, is the wife of Defendant Bernd H. Weber and an accomplice and co-conspirator of Defendants Weber, Chauveau and their respective entities, several of which are named Defendants in this action. Raymonde Weber, via Weber and his alter ego Defendant companies, had unrestricted access to Alvion Properties' assets, trade name, confidential and proprietary business information (including appraisals, geology reports, mining plans, business contacts, financial information and information pertaining to Alvion Properties' financial dealings), trade secrets and goodwill. Raymonde Weber may be served with Summons and a copy of the Complaint by serving her at 5230 Hickory Park Drive, Suite A, Glen Allen, Virginia 23059, which, on information and belief, is her principal place of business, or 55 Kingsbridge Garden Circle, Suite 702, Mississauga, Ontario Canada L5R 1Y1, her principal residence.

11. Defendant Chauveau is a citizen and resident of Portland, Oregon and New York, New York. Chauveau, via Weber and his alter ego Defendant companies, had unrestricted access to Alvion Properties' assets, trade name, confidential and proprietary business information (including appraisals, geology reports, mining plans, business contacts, financial information and information pertaining to Alvion Properties' financial dealings), trade secrets and goodwill. At all relevant times, Chauveau also owned, managed, operated and treated Defendants TimeData Corporation and Time Data Holdings, LLC as his personal bank accounts (and continues to do so) in such a way that these entities are his alter egos because in such entities, corporate formalities are not followed, separate and distinct books and records are not maintained and/or the entities are undercapitalized. Chauveau also is a Director of Defendants

Case 3:08-cv-00866   Document 1   Filed 09/12/08   Page 4 of 46 PageID #: 4

American Gulf and Alvion Partners, which are wholly-owned and controlled by Weber. Chauveau may be served with Summons and a copy of the Complaint by serving him at 333 NW 9th Avenue, No. 411, Portland, Oregon 97209 or 447 West 56th Street, New York, New York 10019, his residences and/or principal places of business.

12.     Defendant Howard is a citizen and resident of Kingsport, Tennessee. At all relevant times, Howard was a consultant for Alvion Properties and had access to Alvion Properties' assets, trade name, confidential and proprietary business information (including appraisals, geology reports, mining plans, business contacts, financial information and information pertaining to Alvion Properties' financial dealings), trade secrets and goodwill, which he now threatens to wrongfully encumber and/or misappropriate for his own financial benefit. Howard may be served with Summons and a copy of the Complaint by serving him at 1710 Skyland Falls Court, Kingsport, Tennessee, 37664, his principal residence or 1128 Laurel Street, Webber City, Virginia 24290, his principal place of business.

13.     Defendant American Gulf is a corporation organized under the laws of St. Vincent and the Grenadines. American Gulf is wholly-owned and controlled by Weber. American Gulf also is the alter ego of Weber in that corporate formalities are not followed, separate and distinct books and records are not maintained, it is undercapitalized and/or Weber uses it as his personal bank account. Chauveau is a Director of American Gulf. American Gulf may be served with Summons and a copy of the Complaint by serving Weber, one of its officers and/or directors, at 5230 Hickory Park Drive, Suite A, Glen Allen, Virginia 23059, or 55 Kingsbridge Garden Circle, Suite 702, Mississauga, Ontario Canada L5R 1Y1. American Gulf also may be served with process by serving any officer or registered representative at P.O. Box

613, Kingstown, St. Vincent & the Grenadines or c/o Weber, Krapp & Kollegen, Steuerberatungsgesellschaft mbH, Bahnhofstrasse 18, D-59929, Brilon, Germany.

14.     Defendant Alvion Partners is a limited liability company organized under the laws of the State of Delaware. Alvion Partners is wholly-owned and controlled by Weber. Alvion Partners also is the alter ego of Weber in that corporate formalities are not followed, separate and distinct books and records are not maintained, it is undercapitalized and/or Weber uses it as his personal bank account. Chauveau is a Director of Alvion Partners. Alvion Partners may be served with Summons and a copy of the Complaint by serving Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808, its registered agent for service of process.

15.     Defendant Weber, LLC is a limited liability company organized under the laws of the State of Delaware. Weber, LLC is wholly-owned and controlled by Weber. Weber, LLC also is the alter ego of Weber in that corporate formalities are not followed, separate and distinct books and records are not maintained, it is undercapitalized and/or Weber uses it as his personal bank account. Weber, LLC may be served with Summons and a copy of the Complaint by serving Incorporating Services, Ltd., 3500 South Dupont Highway, Dover, Delaware 19901, its registered agent for service of process.

16.     Defendant AGF Realty is a limited liability company organized under the laws of the State of Delaware. AGF Realty is wholly-owned and controlled by Weber. AGF Realty also is the alter ego of Weber in that corporate formalities are not followed, separate and distinct books and records are not maintained, it is undercapitalized and/or Weber uses it as his personal bank account. AGF Realty may be served with Summons and a copy of the Complaint by serving

registered Agents Legal Services, LLC, 1220 N. Market Street, Suite 806, Wilmington, Delaware 19801, its registered agent for service of process.

17.     Defendant TimeData Corporation is a corporation organized under the laws of the State of Delaware. TimeData Corporation is 70% owned and controlled by Chauveau, its founder and CEO. TimeData Corporation also is the alter ego of Chauveau in that corporate formalities are not followed, separate and distinct books and records are not maintained, it is undercapitalized and/or Chauveau uses it as his personal bank account. TimeData Corporation may be served with Summons and a copy of the Complaint by serving any officer or registered representative—including Chauveau, its President and CEO—at 447 West 56th Street (1st Floor), New York, New York 10019, its principal place of business, or by serving The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801, its registered agent for service of process.

18.     Defendant Time Data Holdings, LLC is a limited liability company organized under the laws of the State of Delaware. Time Data Holdings, LLC is owned and controlled by Chauveau, its founder and CEO. Time Data Holdings, LLC also is the alter ego of Chauveau in that corporate formalities are not followed, separate and distinct books and records are not maintained, it is undercapitalized and/or Chauveau uses it as his personal bank account. Time Data Holdings, LLC may be served with Summons and a copy of the Complaint by serving any officer or registered representative—including Chauveau, its President and CEO—at 447 West 56th Street (1st Floor), New York, New York 10019, its principal place of business, or by serving Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808, its registered agent for service of process.

**19.** Defendants Weber, Raymonde Weber, American Gulf, Alvion Partners, Weber, LLC and AGF Realty collectively may be referred to as the "Weber Defendants."

**20.** Defendants Chauveau and TimeData collectively may be referred to as the "Chauveau Defendants."

**21.** All of Defendants' wrongful actions described herein were committed (and continue to be committed) by Weber, Raymonde Weber, and/or Chauveau, individually and/or by and/or through (and/or in concert with) each other, third-party non-Defendants and/or Defendants American Gulf, Alvion Partners, Weber, LLC, AGF Realty, and/or TimeData.

## BACKGROUND FACTS

**22.** In 1999, Medley and Reynolds purchased all of the stock of Alvion Properties from Howard in exchange for a two million dollar ($2 million USD) renewable note (the "Howard Note"). The Howard Note currently is a personal note signed by Medley and Reynolds in their individual capacities, not collateralized by any Alvion Properties assets and due on December 31, 2008.

**23.** After acquiring Alvion, Medley and Reynolds, with Howard serving as a consultant, made several unsuccessful attempts to structure a financial vehicle to monetize Alvion Properties' coal reserves. During 2005, Plaintiffs were introduced to Weber, who represented to Plaintiffs that he was a successful and experienced international financier capable of achieving Plaintiffs' financial goals.

**24.** Plaintiffs first met with Weber on August 18, 2005 in Nashville, Tennessee. Their meetings lasted for three days. Prior to the meeting, on June 24, 2005, Weber executed a confidentiality and non-disclosure agreement with Plaintiffs on behalf of his company, American Gulf. Pursuant to the agreement, Weber is prohibited from disclosing or revealing to any third

party any and all confidential information provided by or acquired from Alvion Properties, including specifically, among other things, all financial information, contract terms, product or technology information, financing arrangements and information concerning the identity of financial institutions and business contacts. During the meetings, Plaintiffs explained their interest in monetizing Alvion Properties' coal reserves and, based on the non-disclosure agreement executed by Weber, began to divulge to Weber confidential and proprietary information about Alvion Properties and themselves, including information about Alvion Properties' assets, finances, financial dealings, business contacts, business relationships, trade secrets and goodwill.

25.     During these meetings, and in subsequent meetings in Nashville, Tennessee (Plaintiffs and Weber frequently met at the Nashville Airport Marriott Hotel as it was convenient for all of the Parties), Weber repeatedly represented to Plaintiffs and/or led them to believe that he had numerous contacts in the worldwide capital markets that uniquely positioned him to successfully complete the project. Weber represented that he and American Gulf had European partners and institutional partners, which he would work with to monetize the Alvion Properties coal reserves. More important, Weber continually represented to Plaintiffs and/or led them to believe that he had their best interests at heart.

26.     As a result of Weber's representations during the August 2005 meetings in Nashville, Plaintiffs retained Weber via American Gulf as a consultant with the charge to construct the financial vehicle to monetize Alvion Properties' coal reserves. On August 18, 2005, at an Alvion Properties Board meeting in Nashville, Weber convinced Plaintiffs that in order to monetize the coal reserves, Alvion Properties would have to adopt a Board resolution that he had written and brought to the meeting. The Board resolution granted American Gulf full

Case 3:08-cv-00866   Document 1   Filed 09/12/08   Page 9 of 46 PageID #: 9

authority to complete suitable arrangements for the funding of Alvion Properties' projects and assigned the Alvion Properties' coal reserves to American Gulf. Based upon Weber's representation that the assignment was necessary, Plaintiffs passed the Board resolution assigning the coal reserves to Weber's wholly-owned company, American Gulf. The assignment was later terminated and rescinded on March 7, 2006, after Weber was not successful in monetizing the coal assets through American Gulf during that time period.

27. Thereafter, on September 14, 2005, Weber prepared and executed an agreement between Alvion Properties and American Gulf requiring that all external expenses and overhead incurred to process a transaction to monetize the Alvion Properties coal assets were subject to written pre-approval by Alvion Properties.

28. On September 22, 2005, and in an effort to bestow upon Weber additional credibility so that he could better represent Plaintiffs in the worldwide financial markets, Plaintiffs appointed Weber Director of Finance for Alvion Properties, and on September 27, 2006, appointed Weber Chief Financial Officer ("CFO") of Alvion Properties.

29. Plaintiffs worked closely with Weber on the coal reserve monetization project, meeting numerous times during 2005-2008 in Nashville to provide Weber with increasing amounts of confidential and proprietary information about Alvion Properties and themselves, as well as to review and discuss potential investment vehicles. Weber represented multiple times that he needed further confidential and proprietary information about Alvion Properties, such as financial data, financial reports, appraisals, audits, accounting reports, surveys, plans, geology reports, mining plans, engineering reports and plans, facilities reports and plans, designs, maps, lay-outs, business contacts, business relationships, and information pertaining to Alvion Properties' financial dealings. Based upon the confidentiality and non-disclosure agreement

Weber executed, and his role as a director and/or officer of Alvion Properties Plaintiffs complied with Weber's requests and gave him unfettered access to their confidential and proprietary information and business contacts. In fact, Plaintiffs and Weber worked so closely together on the project that they developed relationships of mutual respect and trust to the point that they became personal friends. Their friendships developed to the point that Weber spent time with Plaintiffs in their homes.

30.     During late 2006, Weber learned about Melland Group, LLC ("Melland"), a financial consulting company based in Oregon that is the exclusive United States licensee of a substantial portfolio of financial-based intellectual property (the "Melland Technology"). Weber, ostensibly on behalf of Plaintiffs, approached Melland to review and evaluate the Melland Technology with the view of using all or a portion of it as the financial vehicle to monetize Alvion Properties' coal reserves.

31.     As a condition of accessing the Melland Technology, Weber, on December 27, 2006, and as CFO of Alvion Properties, executed a Confidentiality, Non-Disclosure and Non-Utilization Agreement (the "CNDA") with Melland, pursuant to which Weber agreed, among other things, to:

(i)     maintain the confidentiality of the Melland Technology and limit its disclosure;

(ii)    not duplicate and/or distribute the Melland Technology for any purpose other than Melland's legitimate business purposes; and/or

(iii)   not use, discuss and/or disclose the Melland Technology for <u>any</u> purpose without prior written approval of Melland.

Weber, however, did not tell Plaintiffs about Melland or the Melland Technology until a later time, and never told Plaintiffs that he had executed the CNDA with Melland on behalf of Alvion Properties.

Case 3:08-cv-00866   Document 1   Filed 09/12/08   Page 11 of 46 PageID #: 11

**32.** Pursuant to the executed CNDA, and throughout the first half of 2007, Melland disclosed, in detail, to Weber, the intricacies and nuances of the Melland Technology. As part of his dealings with Melland, Weber met and befriended Chauveau, Melland's Chief Information Officer. In addition to serving as the Melland CIO, Chauveau also owned and operated TimeData, a company that owns and licenses financial time stamping technology (and continues to do so).

**33.** It was while learning about the Melland Technology in the first half of 2007 that Weber, on information and belief, first concocted his scheme to steal the Melland Technology from Melland, steal Alvion Properties from Medley and Reynolds and steal any proceeds from Alvion Properties' use of the Melland Technology to monetize the coal reserves.

**34.** As part of his scheme, on July 2, 2007, during an Alvion Properties Board meeting in Nashville, Weber convinced Plaintiffs that in order to monetize the coal assets, Alvion Properties would be required to grant unrestricted authority to Weber's company, American Gulf, to arrange for the creation of a trust to be collateralized by Alvion Properties' assets, the costs for which American Gulf would finance. Accordingly, Plaintiffs passed a Board resolution that Weber had written and brought to the Board meeting granting such authority to Weber via American Gulf. In fact, Weber repeatedly represented to Medley and Reynolds— during subsequent meetings in Nashville and/or via the telephone—that the only way he could demonstrate to the worldwide financial markets that he possessed the necessary Alvion Properties' authority to structure an investment vehicle to monetize the coal reserves was for Medley and Reynolds to execute irrevocable stock transfer agreements in favor of Weber that irrevocably transferred to Weber the right to "transfer, sell, assign or pledge" the Alvion Properties stock.

**35.** Medley and Reynolds initially refused to do so, offering instead to travel with Weber wherever necessary to assure potential banks and financial institutions that Medley and Reynolds owned Alvion Properties and Weber was fully authorized to negotiate an investment vehicle to monetize the Alvion Properties' coal reserves. Weber, however, refused their offer, told Medley and Reynolds that the banks and other financial institutions would not allow them to attend meetings and insisted that they execute the irrevocable stock transfers.

**36.** On July 17, 2007, Weber responded to questions that Plaintiffs asked about Weber's current plans to monetize the coal reserves, including a question about what happened if Weber did not generate a profit for Alvion Properties utilizing the coal reserves. Weber reassured Plaintiffs that Alvion Properties could demand the return of its assets at any given time.

**37.** On September 1, 2007, Weber travelled to Melland's corporate offices in Portland, Oregon to further learn about the Melland Technology. Immediately upon his return, and based on Weber's repeated representations and assurances that (i) the irrevocable stock transfers were absolutely necessary for him to structure an investment vehicle to monetize Alvion Properties' coal reserves, (ii) the irrevocable stock transfers would be used by Weber solely for the purpose of structuring the investment vehicle, and (iii) the irrevocable stock transfers could be voided at any time and would be voided immediately thereafter, Medley and Reynolds agreed to execute the stock transfers.

**38.** Weber prepared the one-page "Irrevocable Stock Power Forms." On September 3, 2007, and without receiving any consideration from Weber or any of the other Defendants, Medley and Reynolds each executed an "Irrevocable Stock Power Form," which purport to:

> [I]rrevocably constitute and appoint American Gulf Finance Corporation, P.O. Box 613, Kingstown, St. Vincent & the Grenadines [their] attorney to transfer,

Case 3:08-cv-00866   Document 1   Filed 09/12/08   Page 13 of 46 PageID #: 13

sell, assign or pledge, all or any portion of the stock described herein, unto any party under the sole discretion of American Gulf Finance Corporation, with full power of substitution in the premises.

In other words, rather than transferring to Weber, as CFO of Alvion Properties, the right to "transfer, sell, assign or pledge" their Alvion Properties stock, Weber required Medley and Reynolds to transfer the right to "transfer, sell, assign or pledge" their Alvion Properties stock to Defendant American Gulf, Weber's wholly-owned corporation. Plaintiffs did so, in part, based upon Weber's representation that more than the prior assignment of the coal reserves was needed to successfully monetize them, the history between the parties of terminating the assignment of the coal reserves to American Gulf, and Weber's representation that Alvion Properties could demand the return of its assets (*i.e.*, the coal reserves) at any time.

39.    After participating in multiple in-depth meetings and conferences with Melland to learn about the Melland Technology, Weber, in November 2007, represented to Melland that Alvion Properties was prepared to move forward with licensing and implementing the Melland Technology. Accordingly, on November 6, 2007, Weber, on behalf of American Gulf, entered into an agreement with Melland, pursuant to which he would cause Alvion Properties to transfer coal assets into a trust named AGF Resources Trust I, cause Alvion Properties to transfer shares of Alvion Properties stock to a second trust, and pledge one million dollars worth of Alvion Properties land to cover "any and all expenses" associated with the project.

40.    Similarly, on November 7, 2007, Melland and Weber, signing for Alvion Properties, entered into a Consulting Agreement, pursuant to which Melland ("Consultant") agreed to implement the Melland Technology for Alvion Properties ("Company"). Pursuant to the terms of the Consulting Agreement, Alvion Properties would secure a billion dollar line of credit from a consortium of New York banks. Melland would then apply the Melland

Case 3:08-cv-00866  Document 1  Filed 09/12/08  Page 14 of 46 PageID #: 14

Technology to the line of credit to yield investment income. The difference between the investment income and the cost of the line of credit would be the investment profits, which would then be split by Melland and Alvion Properties pursuant to the terms of the Consulting Agreement.

41.     Weber used his personal German address as the address to which Melland was to send all written notices under the Consulting Agreement to Alvion Properties instead of Alvion Properties' true corporate address, upon information and belief, in an attempt to hide the Consulting Agreement from Plaintiffs. Though Plaintiffs later learned that Weber was working with Melland to devise a plan to monetize the coal reserves, Plaintiffs had no knowledge of the Consulting Agreement until April 2008.

42.     Under the terms of the Consulting Agreement, Melland required a retainer from Alvion Properties. Weber insisted that Melland invoice Alvion Properties for a retainer in a higher amount than Melland otherwise needed to cover expenses so that Weber could utilize a portion of the funds for his own personal benefit. Specifically, Weber required Melland to include an extra $110,000 for himself, comprised of a $50,000 personal retainer to Weber, $40,000 to Weber for consulting and $20,000 for Weber's travel and incidental expenses. At the same time, Weber directed Melland to include narrative in the invoice to Alvion Properties that the additional amounts were for services and expenses related to the trust, AGF Resources Trust I, although the narrative specifically did not mention that the money was being paid to Weber.

43.     On October 14, 2007, Plaintiffs established a line of credit for one million dollars at Farmer's State Bank in Harrisburg, Illinois, using Alvion Properties' property as collateral, based upon Weber's representations that this money was needed to commence the process of monetizing the coal reserves. On November 6, 2007, Melland presented Weber with the invoice

COMPLAINT AND JURY DEMAND

15

for the retainer that included the $110,000 for Weber, which Weber immediately approved and submitted to Farmer's State Bank for payment. Farmers State Bank and Plaintiffs requested supporting documentation for the invoice. On November 6, 2007, Weber informed them that there was not any documentation included with the invoice. At the same time, and appearing to contradict himself, Weber also informed them that no such documentation was available for review outside of the banking institution, seemingly implying that documentation did exist. Plaintiffs authorized the Farmer's State Bank to pay Melland which, in turn, paid Weber the $110,000.

**44.** As a result of the Melland/Weber meetings, Weber also represented to Melland that he could license the Melland Technology to several other companies and financial institutions based on his contacts in the worldwide financial markets. In that he fashioned himself a "free agent" in the financial marketplace, Weber suggested the best way for him to go about securing additional licensing agreements was for Melland to bestow on him a title. Based on Weber's representations, Melland appointed Weber Senior Vice-President, Project Development, in charge of its energy assets division. As a condition of receiving this appointment, Weber, on October 29, 2007, executed a second CNDA with Melland—this time on behalf of American Gulf, Weber's wholly-owned company.

**45.** On November 26, 2007, Weber, Allain de la Motte ("de la Motte"), the inventor of the Melland Technology, Robert West ("West"), President of Melland, and Thomas L. Estes ("Estes"), then acting Melland Chief Investment Officer, traveled to New York for two weeks of meetings, the principal purpose of which was to engage BNY Mellon to (i) serve as the trustee for Alvion Properties' coal assets as part of implementing the Melland Technology, and (ii)

Case 3:08-cv-00866   Document 1   Filed 09/12/08   Page 16 of 46 PageID #: 16

provide or, alternatively, syndicate with other banks a credit facility utilizing the coal reserves as collateral. Again, Weber never told Plaintiffs about the meetings.

46. On November 29, 2007, Weber incorporated Alvion Partners, LLC in Delaware, intentionally choosing a name designed to be confusingly similar and/or associated with Alvion Properties, without Plaintiffs' knowledge or authorization. Without Plaintiffs' knowledge or authorization, Weber represented on Alvion Partners' balance sheet that as of December 12, 2007, Alvion Partners owned 100% of the issued and outstanding common shares of Alvion Properties. Alvion Partners is wholly-owned by Weber. Alvion Properties has never had any ownership interest in Alvion Partners or vice versa.

47. Despite Weber's agreement with Plaintiffs that American Gulf would finance all expenses associated with creating a trust to monetize Alvion Properties' coal reserves, Weber systematically charged Alvion Properties for these expenses. In December 2007, pursuant to the Consulting Agreement, Melland invoiced Alvion Properties for expenses due under Section 4(e) of the Consulting Agreement. When Weber, on behalf of Alvion Properties, received the invoice, he required Melland to resubmit the invoice, remove any reference to the Consulting Agreement and that the expenses were for "prior legal fees" (totaling $135,000), and replace it with narrative stating that the bill was for services rendered and expenses incurred for pre-capitalization expenditures for the AGF Resources Trust I.

48. Weber presented Plaintiffs with the revised invoice as part of his ongoing scheme to hide the Consulting Agreement with Melland from Plaintiffs, as well as to hide the fact that he was charging Alvion Properties for legal fees associated with the formation of Weber's company, Alvion Partners. Similarly, on February 1, 2008, Stephen Field, an attorney for Melland, invoiced Melland, "on behalf of Alvion Properties," for legal services including

Case 3:08-cv-00866 Document 1 Filed 09/12/08 Page 17 of 46 PageID #: 17

charges for the formation of two more of Weber's wholly-owned companies, AGF Services, LLC and Alvion Grantor Trust. Weber formed these entities without Plaintiffs' authorization or knowledge and reimbursed Melland using Alvion Properties' funds. At all times, Alvion Properties has had no ownership interest in AGF Services, LLC and/or the Alvion Grantor Trust or vice versa.

**49.** While in New York, on or about December 3, 2007, Weber's computer crashed. Chauveau offered to fix it. For several days, Chauveau and Weber worked together on the computer at Chauveau's office while de la Motte, West and Estes attended the meetings. While working on the computer, Weber and Chauveau had ample time to privately discuss and plot how they could steal, market, license and/or implement the Melland Technology for their own personal benefit. They also had ample time to discuss how Weber had swindled the irrevocable stock transfers from Medley and Reynolds and what he planned to do with them.

**50.** The end result of their discussions was an agreement and scheme to work together—through their various and myriad wholly-owned companies—to steal the Melland Technology and steal Alvion Properties from Medley and Reynolds. As part of the scheme, Weber later named Chauveau to the Board of Directors of both American Gulf and Alvion Partners.

**51.** From December 4-8, 2007, and as part of their scheme to misappropriate the Melland Technology, Chauveau and Weber engaged de la Motte in numerous in depth discussions to further learn about de la Motte's ideas for implementing the Melland Technology as a partial solution to the global liquidity crisis. During the discussions, de la Motte revealed to Chauveau and Weber additional intricacies and nuances of the Melland Technology. Out of these discussions was borne the concept of an institutional capital enhancement funding

COMPLAINT AND JURY DEMAND

18

("ICEF") program utilizing a derivative of the Melland Technology, which was protected at the time by five (5) CNDAs executed by Chauveau and Weber (and/or their companies and principals).

**52.**     In November/December 2007, Weber represented to Plaintiffs that he needed physical possession of the Alvion Properties original stock certificates to complete monetization of the coal reserves. Plaintiffs sent the original stock certificates to Weber in Canada. Weber forwarded the stock certificates to Seward & Kissell, Melland's New York attorneys. Weber did not give Plaintiffs the option of sending the stock certificates directly to Seward & Kissell.

**53.**     In early January 2008, Melland initiated discussions with representatives of Deloitte and Touche, LLP ("Deloitte") in New York to explore a consultancy with Deloitte regarding "banking and accounting regulations" relating to the ICEF Program. Melland and Deloitte ultimately executed a CNDA after several weeks of negotiations. During February 2008, Weber and Chauveau secretly attempted to leverage the Melland/Deloitte relationship by requesting funds from Medley and Reynolds to secure Deloitte's endorsement of the ICEF Program that they, in turn, intended to use in their secret efforts to personally profit from the Melland Technology.

**54.**     On January 18, 2008, Melland learned that on or about December 19, 2007, while supposedly working on the Melland/Alvion Properties deal, Weber, without Plaintiffs' knowledge and/or Melland's knowledge, surreptitiously executed a CNDA with Commerce Bancorp in Cherry Hill, New Jersey, by falsely representing to Commerce Bancorp in a letter that Defendants AGF Realty and Alvion Partners—two of Weber's wholly-owned companies— owned a license to the Melland Technology. To add insult to injury, Weber executed the bogus CNDA in the names of Defendants AGF Realty and Alvion Partners.

COMPLAINT AND JURY DEMAND

19

**55.** At the same time, Weber and Chauveau were out in the financial markets attempting to license the Melland Technology for their own purposes despite their roles as officers of Melland and Alvion Properties. Weber and Chauveau approached Melland about forming a joint venture, to which Melland would transfer the Melland Technology. Recognizing that it would relinquish significant ownership and control of the Melland Technology to Weber and Chauveau, Melland declined to enter into the proposed joint venture. As a result, on or about January 22, 2008, Weber and Chauveau stated their intention to take the Melland Technology outright and "go it alone" without Melland.

**56.** That very day, January 22, 2008, and consistent with their threats and stated intentions, Weber and Chauveau secretly emailed to Brad Henshaw, Senior Vice President of Farmer's State Bank in Harrisburg, Illinois, and Plaintiffs' banker, a portion of the ICEF Program, thereby misappropriating the Melland Technology and disclosing it without authorization in violation of their individual CNDAs and the Melland/Alvion Properties Consulting Agreement.

**57.** On February 7, 2008, Weber and Chauveau called a meeting with Seward & Kissell, during which Weber and Chauveau announced they were unilaterally ending their business relationship with Melland. During the meeting, without Plaintiffs' knowledge or authorization, Weber requested that Seward & Kissell, which had been safekeeping Plaintiffs' Alvion Properties stock certificates (representing 100% of the Alvion Properties stock), give the certificates to him.

**58.** On March 12, 2008, Weber met with Plaintiffs in Nashville for an Alvion Properties Board meeting and represented to Plaintiffs that the Melland deal had fallen through. Based upon his representations, omissions and concealment, Weber convinced Plaintiffs to adopt

Case 3:08-cv-00866   Document 1   Filed 09/12/08   Page 20 of 46 PageID #: 20

a Board resolution that he had written and brought to the Board meeting granting Weber, as a Board member, full and unlimited authority, under his full discretion and judgment, to unwind business relationships with Melland, its related officers, Seward & Kissell, Stephen Field and Bank of New York Mellon. Continuing with his scheme, Weber also convinced Plaintiffs that in order to monetize Alvion Properties' coal reserves, Weber and/or Alvion Partners required unlimited authority to direct and complete suitable financial structures collateralized by Alvion Properties' assets. Based upon Weber's continued representations, Plaintiffs passed the Board resolution that Weber had written and brought to the meeting reflecting these terms.

59.    At some time prior to this March 2008 Nashville meeting, Weber informed Plaintiffs about Alvion Partners and that there were one or more other "Alvion" entities created in connection with the coal reserve monetization trust. However, Weber did not inform Plaintiffs that these were his wholly-owned companies. Though Plaintiffs had not given him authorization to create these "Alvion" entities, based upon Weber's representations, Plaintiffs were led to believe that these "Alvion" entities were owned by Alvion Properties.

60.    Notwithstanding their executed Alvion Properties confidentiality and non-disclosure agreement, CNDAs with Melland and the Melland/Alvion Properties Consulting Agreement, on March 17, 2008, Defendant Alvion Partners, Weber's wholly-owned company, delivered an ICEF Program deal sheet to Farmer's State Bank claiming that it was developed and owned by Defendant Alvion Partners. The deal sheet does not mention Melland and/or Alvion Properties. In an accompanying Power Point presentation, Weber represented to Farmer's State Bank that Alvion Partners owned 100% of the issued and outstanding common shares of Alvion Properties stock.

Case 3:08-cv-00866   Document 1   Filed 09/12/08   Page 21 of 46 PageID #: 21

61.     On March 27, 2008, TimeData invoiced Alvion Properties over $68,000 for professional services rendered for Phase I of an APInvent Program. Weber approved payment to Chauveau's company. However, Plaintiffs did not authorize this payment. Plaintiffs have not received an APInvent Program from TimeData.

62.     On or about April 4, 2008, counsel for Plaintiffs received a telephone call from an attorney for Melland, David Cooper. Upon receipt of the telephone call, when Plaintiffs inquired as to whether Weber knew David Cooper, Weber instructed Plaintiffs to refrain from any communications with parties directly or indirectly related to Melland. Through a series of subsequent conversations in April 2008, Plaintiffs finally learned about the Consulting Agreement and Weber's secret scheme began to unravel.

63.     On May 7, 2008, Alvion Properties shareholders met in Nashville and adopted resolutions (i) terminating Weber as an officer and/or director, (ii) rescinding all authority previously given to Weber and/or his companies pursuant to all oral, written and/or consulting agreements, board resolutions and/or shareholder actions, (iii) requiring Weber to immediately cease acting, in any manner and/or capacity, on behalf of or for Alvion Properties, including using the "Alvion " name in any capacity, and (iv) requiring Weber to return all proprietary Alvion Properties information in his possession. Alvion Properties issued notice to Weber of these resolutions. To date, Weber has not returned any of Alvion Properties' proprietary information.

64.     In late June 2008, Estes revealed to West, for the first time, that while in New York in August 2007, he and Chauveau met privately several times to discuss how a particular application of the Melland Technology (known as the "card game") could be implemented for the benefit of TimeData, Chauveau's company, to assist with raising capital. Estes and

Chauveau had several follow-up conversations after Estes returned to California. During one of these telephone conversations, the following exchange took place:

**Chauveau**: "You know, Tom, we don't need Allain [de la Motte] and Bob [West] to do this...we can do it without them."

**Estes**: "...but we owe Bob and Allain."

**Chauveau**: "we don't owe them shit."

This revelation punctuates what happened in reality and proves that the Defendants' scheme to misappropriate the Melland Technology and later, Alvion Properties, was in the works and/or operational at least as early as August 2007.

65. On August 12, 2008, Weber on behalf of American Gulf, notified Plaintiffs that it had exercised the fraudulently obtained irrevocable stock transfers and American Gulf and Alvion Partners now owned Alvion Properties. Weber declared that Alvion Properties had resolved that the stock certificates held by Plaintiffs are null and void and purported to reissue new certificates to his companies and authorize stock splits. Weber further declared that Alvion Properties had adopted a resolution absolving him of all fiduciary responsibility he may have or had to Alvion Properties.

66. During this time, Weber also enlisted the now willing assistance of Howard to do Weber's dirty work in connection with the scheme to steal and take control of Alvion Properties and its coal reserves. Notwithstanding the fact that the Howard Note is not collateralized by any assets owned by Alvion Properties and the Howard Note is not due and payable until December 31, 2008, Howard now demands that it be paid by September 15, 2008. Howard has repeatedly threatened Plaintiffs that if the Howard Note is not paid by September 15, 2008, he will "take them down," "destroy them," "go to their bankers and reveal them as frauds," file an encumbrance on the land owned by Alvion Properties containing the coal reserves, and further

Case 3:08-cv-00866  Document 1  Filed 09/12/08  Page 23 of 46 PageID #: 23

interfere with Plaintiffs' existing prospective business relationships and/or economic opportunities.

67. Weber also "terminated" Medley and Reynolds from their roles as directors and officers of Alvion Properties. Weber also declared that all Board resolutions and meeting minutes since September 3, 2007 were null and void because Medley and Reynolds had no voting rights since that date, despite the fact that Weber had personally written, advocated and procured execution of the resolutions and meeting minutes of Alvion Properties by Medley and Reynolds since September 3, 2007. Weber further declared that he had perfected a lien against Alvion Properties' assets under the UCC, filing DCN/Number 08071471820 on July 14, 2008 for services allegedly rendered to Alvion Properties.

68. Concurrently and since that time, and utilizing the fraudulently obtained irrevocable stock transfers, Defendants have actively engaged in a scheme to steal and take control of Alvion Properties by, *inter alia*, (i) unilaterally and without authorization establishing a new office for Alvion Properties at 5230 Hickory Park Drive, Suite A, Glen Allen, Virginia 23059, (ii) unilaterally and without authorization contacting the Virginia State Corporation Commission and removing Medley and Reynolds as officers and directors of Alvion Properties and installing Weber as President and Chairman of the Board and Raymonde Weber Secretary/Treasurer, (iii) unilaterally and without authorization changing Alvion Properties' registered agent in Virginia to Virginia Professional Services, LLC, which also is housed at 5230 Hickory Park Drive, Suite A, Glen Allen, Virginia 23059 and, on information and belief, is owned and operated by one or more Defendants, (iv) unilaterally and without authorization contacting Alvion Properties' banks, including Sovereign Bank and Farmer's State Bank, and attempting to freeze and/or confiscate Alvion Properties' assets, (v) communicating to third

parties, both orally and in writing, that Defendants—not Medley and Reynolds—own and control Alvion Properties, (vi) attempting to engage in financial transactions utilizing Alvion Properties' trade name and assets, and (vii) threatening to encumber (and/or encumbering) the land owned by Alvion Properties containing the coal reserves without a legal basis to do so, all to the financial benefit of Defendants and the financial detriment of Plaintiffs.

## CLAIMS FOR RELIEF/CAUSES OF ACTION

### COUNT I

### BREACH OF FIDUCIARY DUTY

### (AGAINST ALL DEFENDANTS)

**69.** The preceding factual statements and allegations are incorporated herein by reference.

**70.** As a former officer of Alvion Properties, Weber (and, by extension, his wholly-owned companies) had (and continues to have) unrestricted access to Alvion Properties' assets, trade name, confidential and proprietary business information (including appraisals, geology reports, business contacts, financial information and information pertaining to Alvion Properties' financial dealings), trade secrets and goodwill. As a purported current officer of Alvion Properties, Raymonde Weber had (and continues to have) unrestricted access to Alvion Properties' assets, trade name, confidential and proprietary business information (including appraisals, geology reports, business contacts, financial information and information pertaining to Alvion Properties' financial dealings), trade secrets and goodwill. As an officer of Melland, Melland's agent in connection with the Melland/Alvion Properties deal and Weber's accomplice, Chauveau (and, by extension, his wholly-owned companies), as well Howard as a consultant to Alvion Properties, had (and continue to have) unrestricted access to Alvion Properties' assets,

Case 3:08-cv-00866   Document 1   Filed 09/12/08   Page 25 of 46 PageID #: 25

trade name, confidential and proprietary business information (including appraisals, geology reports, mining plans, business contacts, financial information and information pertaining to Alvion Properties' financial dealings), trade secrets and goodwill. As such, Defendants were (and continue to be) in personal, confidential and fiduciary relationships with Plaintiffs.

71.     As fiduciaries, Defendants owed Plaintiffs (i) the commitment to deal fairly and honestly, (ii) the duties of good faith and undivided loyalty, and (iv) integrity of the strictest kind. Defendants were (and continue to be) obligated to exercise the highest degree of care in carrying out their obligations to Plaintiffs under their confidential, special and fiduciary relationships with Plaintiffs.

72.     As an officer of Alvion Properties, Weber owed Plaintiffs the duty to discharge all duties in good faith, with the care an ordinarily prudent person in a like position would exercise under similar circumstances and in a manner the officer reasonably believes to be in the best interest of Alvion Properties, pursuant to Tenn. Code §48-18-403 (2008).

73.     Defendants breached (and continue to breach) their fiduciary duties to Plaintiffs by, *inter alia,* (i) unilaterally and without authorization establishing a new office for Alvion Properties at 5230 Hickory Park Drive, Suite A, Glen Allen, Virginia 23059, (ii) unilaterally and without authorization contacting the Virginia State Corporation Commission and removing Medley and Reynolds as officers and directors of Alvion Properties and installing Weber as President and Chairman of the Board and Raymonde Weber Secretary/Treasurer, (iii) unilaterally and without authorization changing Alvion Properties' registered agent in Virginia to Virginia Professional Services, LLC, which also is housed at 5230 Hickory Park Drive, Suite A, Glen Allen, Virginia 23059 and, on information and belief, is owned and operated by one or more Defendants, (iv) unilaterally and without authorization contacting Alvion Properties' banks and

Case 3:08-cv-00866   Document 1   Filed 09/12/08   Page 26 of 46 PageID #: 26

attempting to freeze and/or confiscate Alvion Properties' assets, (v) communicating to third parties, both orally and in writing, that they—not Medley and Reynolds—own and control Alvion Properties, (vi) attempting to engage in financial transactions utilizing Alvion Properties' trade name and assets, and (vii) threatening to encumber (and/or encumbering) the land owned by Alvion Properties containing the coal reserves without a legal basis to do so, all to the financial benefit of Defendants and the financial detriment of Plaintiffs.

74.     To the extent that any Defendants are fiduciaries who did not breach their fiduciary duties to plaintiffs, such Defendants are nonetheless liable because they had knowledge of the breaches of fiduciary duties committed by other fiduciaries, and did not make reasonable efforts under the circumstances to remedy such fiduciary breaches.

75.     To the extent that any Defendants are not fiduciaries, such Defendants nevertheless incurred fiduciary liability in that they engaged in transactions with breaching fiduciaries under circumstances in which they knew (or should have known) about such fiduciary breaches.

76.     Defendants breached their fiduciary duties to Plaintiffs through the wrongful actions set forth above. Defendants willfully and wantonly breached their fiduciary duties to Plaintiffs or, at the very least, committed these breaches with conscious indifference and reckless disregard of Plaintiffs' rights and interests. Defendants' prior and ongoing wrongful actions constitute breach of fiduciary duty at Tennessee law.

/

/

/

/

## COUNT II

## FRAUD, CONSTRUCTIVE FRAUD AND/OR
## FRAUDULENT CONCEALMENT

### (AGAINST ALL DEFENDANTS)

**77.** The preceding factual statements and allegations are incorporated herein by reference.

**78.** In order to secure the irrevocable stock transfers from Medley and Reynolds, Weber repeatedly represented to and assured Medley and Reynolds that, *inter alia*: (i) he was a successful, well-connected and experienced international financier capable of achieving Plaintiffs' financial goals, (ii) he had Plaintiffs' best interests at heart, (iii) the irrevocable stock transfers were absolutely necessary for him to structure an investment vehicle to monetize Alvion Properties' coal reserves, (iv) Weber would use the irrevocable stock transfers solely for the purpose of structuring the investment vehicle, and (v) Weber would void the irrevocable stock transfers immediately thereafter. Weber's representations were material to the decision by Medley and Reynolds to (i) retain Weber as a consultant, (ii) later name him the Alvion Properties CFO, (iii) grant Weber unrestricted access to Alvion Properties' assets, trade name, confidential and proprietary business information (including appraisals, geology reports, mining plans, business contacts, financial information and information pertaining to Alvion Properties' financial dealings), trade secrets and goodwill, and (iv) execute the irrevocable stock transfers in favor of Weber and/or his wholly-owned companies.

**79.** Weber made the above false representations to Medley and Reynolds with the intent that they rely upon them and with full knowledge that such representations were false when made. Medley and Reynolds relied on Weber's material and false representations when deciding to (i) retain Weber as a consultant, (ii) later name him the Alvion Properties CFO, (iii)

COMPLAINT AND JURY DEMAND

grant Weber unrestricted access to Alvion Properties' assets, trade name, confidential and proprietary business information (including appraisals, geology reports, mining plans, business contacts, financial information and information pertaining to Alvion Properties' financial dealings), trade secrets and goodwill, and (iv) execute the irrevocable stock transfers in favor of Weber and/or his wholly-owned companies. As a direct and/or proximate result, Medley and Reynolds suffered (and continue to suffer) damages in the form of, *inter alia,* Defendants (i) unilaterally and without authorization establishing a new office for Alvion Properties at 5230 Hickory Park Drive, Suite A, Glen Allen, Virginia 23059, (ii) unilaterally and without authorization contacting the Virginia State Corporation Commission and removing Medley and Reynolds as officers and directors of Alvion Properties and installing Weber as President and Chairman of the Board and Raymonde Weber Secretary/Treasurer, (iii) unilaterally and without authorization changing Alvion Properties' registered agent in Virginia to Virginia Professional Services, LLC, which also is housed at 5230 Hickory Park Drive, Suite A, Glen Allen, Virginia 23059 and, on information and belief, is owned and operated by one or more Defendants, (iv) unilaterally and without authorization contacting Alvion Properties' banks and attempting to freeze and/or confiscate Alvion Properties' assets, (v) communicating to third parties, both orally and in writing, that they—not Medley and Reynolds—own and control Alvion Properties, (vi) attempting to engage in financial transactions utilizing Alvion Properties' trade name and assets, and (vii) threatening to encumber (and/or encumbering) the land owned by Alvion Properties containing the coal reserves without a legal basis to do so, all to the financial benefit of Defendants and the financial detriment of Plaintiffs.

80. By virtue of their personal, confidential, special and fiduciary business relationships with Defendants, Plaintiffs trusted and relied on Defendants to safeguard Alvion

Case 3:08-cv-00866   Document 1   Filed 09/12/08   Page 29 of 46 PageID #: 29

Properties' assets, trade name, confidential and proprietary business information (including appraisals, geology reports, mining plans, business contacts, financial information and information pertaining to Alvion Properties' financial dealings), trade secrets and goodwill. Defendants, as fiduciaries, had the duty to Plaintiffs to act in Plaintiffs' best interests. Plaintiffs, therefore, were in confidential and special business relationships with Defendants that required Defendants not to misappropriate, abstract, use and/or disseminate Alvion Properties' assets, trade name, confidential and proprietary business information (including appraisals, geology reports, mining plans, business contacts, financial information and information pertaining to Alvion Properties' financial dealings), trade secrets and goodwill and/or wrongfully steal and/or take control of Alvion Properties (and kept the resulting financial benefits). Defendants, however, intentionally disregarded and/or refused to fulfill their duties to Plaintiffs and misappropriated, abstracted, used and/or disseminated Alvion Properties' assets, trade name, confidential and proprietary business information (including appraisals, geology reports, mining plans, business contacts, financial information and information pertaining to Alvion Properties' financial dealings), trade secrets and goodwill and/or wrongfully stole and taken control of Alvion Properties (and kept the resulting financial benefits) (and continue to do so).

81.    Defendants also concealed their wrongful actions until a significant amount of the damage to Plaintiffs was done.   All of the above facts were material to the participation (and continued participation) of Plaintiffs in their business relationships with Defendants, including, *inter alia,* Plaintiffs' decision to (i) retain Weber and Howard as consultants, (ii) later name Weber the Alvion Properties CFO, (iii) grant Weber and Howard unrestricted access to Alvion Properties' assets, trade name, confidential and proprietary business information (including appraisals, geology reports, mining plans, business contacts, financial information and

Case 3:08-cv-00866   Document 1   Filed 09/12/08   Page 30 of 46 PageID #: 30

information pertaining to Alvion Properties' financial dealings), trade secrets and goodwill, and (iv) execute the irrevocable stock transfers in favor of Weber and/or his wholly-owned companies.

82. By virtue of the confidential relationships between Plaintiffs and Defendants, Defendants had a duty to disclose the above concealed material facts to Plaintiffs including the fact that they are working together to Plaintiffs' financial detriment. Their deliberate silence, when they had a duty to speak, and the resulting nondisclosure of the above concealed material facts, is the equivalent of false representations and/or omissions. Such false representations and/or omissions were made knowingly and intentionally or, at the very least, in reckless disregard of Plaintiffs' rights and interests.

83. Plaintiffs justifiably relied on Defendants' false representations and/or omissions to their detriment by, *inter alia*, (i) retaining Weber and Howard as consultants, (ii) later naming Weber the Alvion Properties CFO, (iii) granting Weber and Howard unrestricted access to Alvion Properties' assets, trade name, confidential and proprietary business information (including appraisals, geology reports, mining plans, business contacts, financial information and information pertaining to Alvion Properties' financial dealings), trade secrets and goodwill, and (iv) executing the irrevocable stock transfers in favor of Weber and/or his wholly-owned companies. As a direct and proximate result of Defendants' wrongful acts, Plaintiffs, in fact, (i) retained Weber and Howard as consultants, (ii) later named Weber the Alvion Properties CFO, (iii) granted Weber and Howard unrestricted access to Alvion Properties' assets, trade name, confidential and proprietary business information (including appraisals, geology reports, mining plans, business contacts, financial information and information pertaining to Alvion Properties' financial dealings), trade secrets and goodwill, and (iv) executed the irrevocable stock transfers

Case 3:08-cv-00866   Document 1   Filed 09/12/08   Page 31 of 46 PageID #: 31

in favor of Weber and/or his wholly-owned companies.. Defendants' wrongful actions constitute fraud and/or constructive fraud at Tennessee common law.

84.    Defendants concealed their wrongful actions with the intent to mislead and defraud Plaintiffs. Plaintiffs were not aware of, nor, through the exercise of due diligence, could have become aware of Defendants' wrongful actions until such wrongful actions were committed and brought to light by third parties. Due to the Parties' personal, confidential and special business relationships, which were predicated on their mutual trust and confidence, and Defendants' superior knowledge and/or means of knowledge, Defendants had a duty to disclose to Plaintiffs the above material false information. Defendants' failure to do so constitutes fraudulent concealment at Tennessee common law.

## COUNT III

## MISAPPROPRIATION OF TRADE SECRETS

### (AGAINST ALL DEFENDANTS)

85.    The preceding factual statements and allegations are incorporated herein by reference.

86.    Alvion Properties' confidential and proprietary business information (including financial data, financial reports, appraisals, audits, accounting reports, surveys, plans, geology reports, mining plans, engineering reports and plans, facilities reports and plans, designs, maps, lay-outs, business contacts, business relationships, and information pertaining to Alvion Properties' financial dealings) and goodwill collectively constitute trade secrets pursuant to Tenn. Code §47-25-1702 (2008). Plaintiffs made efforts that are reasonable under the circumstances to maintain the secrecy of the Alvion Properties' trade secrets under Tenn. Code §47-25-1702 (2008). Plaintiffs derive independent economic value, actual or potential, from

COMPLAINT AND JURY DEMAND

32

Alvion Properties' trade secrets not being generally known to the public or to other persons who could obtain economic value from their disclosure or use. Tenn. Code §47-25-1702 (2008).

87.     Defendants misappropriated (and continue to misappropriate and wrongfully abstract, use and/or disseminate) Alvion Properties' trade secrets, within the meaning of Tenn. Code §47-25-1702 (2008) by, *inter alia,* (i) acquiring Alvion Properties' trade secrets by improper means including misrepresentation, breach and/or inducement of a breach of a duty to maintain secrecy and limit use, (ii) disclosing and/or using Alvion Properties' trade secrets without Alvion Properties' express or implied consent and/or (iii) acquiring the trade secret information through improper means.

88.     Defendants knew and/or had reason to know that the trade secret information was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, or derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use, by: (i) unilaterally and without authorization establishing a new office for Alvion Properties at 5230 Hickory Park Drive, Suite A, Glen Allen, Virginia 23059, (ii) unilaterally and without authorization contacting the Virginia State Corporation Commission and removing Medley and Reynolds as officers and directors of Alvion Properties and installing Weber as President and Chairman of the Board and Raymonde Weber Secretary/Treasurer, (iii) unilaterally and without authorization changing Alvion Properties' registered agent in Virginia to Virginia Professional Services, LLC, which also is housed at 5230 Hickory Park Drive, Suite A, Glen Allen, Virginia 23059 and, on information and belief, is owned and operated by one or more Defendants, (iv) unilaterally and without authorization contacting Alvion Properties' banks and attempting to freeze and/or confiscate Alvion Properties' assets, (v) communicating to third parties, both orally and in writing, that they—not Medley and Reynolds—own and control

COMPLAINT AND JURY DEMAND                                                      33

Alvion Properties, (vi) attempting to engage in financial transactions utilizing Alvion Properties' trade name and assets, and (vii) threatening to encumber (and/or encumbering) the land owned by Alvion Properties containing the coal reserves without a legal basis to do so, all to the financial benefit of Defendants and the financial detriment of Plaintiffs.

89.     Defendants' prior and ongoing wrongful actions constitute the misappropriation of trade secrets in violation of Tenn. Code §47-25-1702 (2008).

90.     Defendants' misappropriation has been (and continues to be) willful and malicious.

91.     Defendants' misappropriation has resulted in Plaintiffs' financial detriment and will continue to do so unless and until enjoined by this Court.

**COUNT IV**

**INTENTIONAL INTERFERENCE WITH EXISTING BUSINESS RELATIONSHIPS**

**(AGAINST ALL DEFENDANTS)**

92.     The preceding factual statements and allegations are incorporated herein by reference.

93.     Defendants intended to interfere and, in fact interfered with Alvion Properties' existing business relationships with (i) Melland in connection with the Melland/Alvion Properties deal to monetize the coal reserves, (ii) Medley and Reynolds as its officers, directors and shareholders, and (iii) its lenders and/or other financial institutions and/or other third parties by, *inter alia,* (i) unilaterally and without authorization establishing a new office for Alvion Properties at 5230 Hickory Park Drive, Suite A, Glen Allen, Virginia 23059, (ii) unilaterally and without authorization contacting the Virginia State Corporation Commission and removing Medley and Reynolds as officers and directors of Alvion Properties and installing Weber as

President and Chairman of the Board and Raymonde Weber Secretary/Treasurer, (iii) unilaterally and without authorization changing Alvion Properties' registered agent in Virginia to Virginia Professional Services, LLC, which also is housed at 5230 Hickory Park Drive, Suite A, Glen Allen, Virginia 23059 and, on information and belief, is owned and operated by one or more Defendants, (iv) unilaterally and without authorization contacting Alvion Properties' banks and attempting to freeze and/or confiscate Alvion Properties' assets, (v) communicating to third parties, both orally and in writing, that they—not Medley and Reynolds—own and control Alvion Properties, (vi) attempting to engage in financial transactions utilizing Alvion Properties' trade name and assets, and (vii) threatening to encumber (and/or encumbering) the land owned by Alvion Properties containing the coal reserves without a legal basis to do so, all to the financial benefit of Defendants and the financial detriment of Plaintiffs.

**94.** Defendants interfered with Alvion Properties' existing business relationships with Melland, Medley and Reynolds, its lenders, other financial institutions and/or other third parties through improper means and/or for improper purposes. Defendants' interference harmed one or more business relationships between Alvion Properties and Melland, Medley and Reynolds, its lenders, other financial institutions and/or other third parties, and will continue to harm such existing business relationships and damage Alvion Properties unless enjoined by this Court. Defendants' wrongful actions constitute tortuous interference with existing business relationships at Tennessee common law.

## COUNT V

### BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING

#### (AGAINST ALL DEFENDANTS)

**95.** The preceding factual statements and allegations are incorporated herein by reference.

**96.** Defendants' wrongful actions were committed during the time they were engaged in personal, confidential, fiduciary and/or special business relationships with Plaintiffs. As such, Defendants' wrongful actions also constitute breaches of the duty of good faith and fair dealing owed by Defendants to Plaintiffs at Tennessee common law.

### COUNT VI

### CONVERSION

#### (AGAINST ALL DEFENDANTS)

**97.** The preceding factual statements and allegations are incorporated herein by reference.

**98.** By wrongfully and improperly misappropriating, abstracting, using and/or disseminating Alvion Properties' assets, trade name, confidential and proprietary business information (including appraisals, geology reports, mining plans, business contacts, financial information and information pertaining to Alvion Properties' financial dealings), trade secrets and goodwill and/or doing so after lawfully obtaining unrestricted access to Alvion Properties' assets, trade name, confidential and proprietary business information (including appraisals, geology reports, mining plans, business contacts, financial information and information pertaining to Alvion Properties' financial dealings), trade secrets and goodwill, Defendants are wrongfully exercising dominion and control over Alvion Properties' assets, trade name,

COMPLAINT AND JURY DEMAND

36

confidential and proprietary business information (including appraisals, geology reports, mining plans, business contacts, financial information and information pertaining to Alvion Properties' financial dealings), trade secrets and goodwill in defiance of Plaintiffs' right to possess and use such assets, trade name, confidential and proprietary business information (including appraisals, geology reports, mining plans, business contacts, financial information and information pertaining to Alvion Properties' financial dealings), trade secrets and goodwill. Defendants have refused (and continue to refuse) Plaintiffs' demands to stop misappropriating, abstracting, using and/or disseminating Alvion Properties' assets, trade name, confidential and proprietary business information (including appraisals, geology reports, mining plans, business contacts, financial information and information pertaining to Alvion Properties' financial dealings), trade secrets and goodwill. Defendants' wrongful acts constitute conversion at Tennessee common law.

## COUNT VII

### BREACH OF CONTRACT

### (AGAINST THE WEBER DEFENDANTS AND HOWARD)

**99.** The preceding factual statements and allegations are incorporated herein by reference.

**100.** The confidentiality and non-disclosure agreement between Plaintiffs and Weber (and, by extension, the other Weber Defendants) is a viable and enforceable contract. Pursuant to the agreement, Weber (and, by extension, the other Weber Defendants) agreed not to disclose Alvion Properties' assets, trade name, confidential and proprietary business information (including appraisals, geology reports, mining plans, business contacts, financial information and information pertaining to Alvion Properties' financial dealings), trade secrets and goodwill.

**101.** Likewise, the actual and/or implied agreement between Plaintiffs and Howard, as Alvion Properties' consultant, to not wrongfully abstract, use and/or disseminate Alvion Properties' assets, trade name, confidential and proprietary business information (including appraisals, geology reports, mining plans, business contacts, financial information and information pertaining to Alvion Properties' financial dealings), trade secrets and goodwill that Howard received from Plaintiffs as a consultant to Alvion Properties is a viable and enforceable contract. The Weber Defendants and Howard breached (and continue to breach) the above agreements by, *inter alia*, wrongfully abstracting, using and/or disseminating Alvion Properties' assets, trade name, confidential and proprietary business information (including appraisals, geology reports, mining plans, business contacts, financial information and information pertaining to Alvion Properties' financial dealings), trade secrets and goodwill, within the meaning of Tennessee law by, *inter alia,* (i) unilaterally and without authorization establishing a new office for Alvion Properties at 5230 Hickory Park Drive, Suite A, Glen Allen, Virginia 23059, (ii) unilaterally and without authorization contacting the Virginia State Corporation Commission and removing Medley and Reynolds as officers and directors of Alvion Properties and installing Weber as President and Chairman of the Board and Raymonde Weber Secretary/Treasurer, (iii) unilaterally and without authorization changing Alvion Properties' registered agent in Virginia to Virginia Professional Services, LLC, which also is housed at 5230 Hickory Park Drive, Suite A, Glen Allen, Virginia 23059 and, on information and belief, is owned and operated by one or more Defendants, (iv) unilaterally and without authorization contacting Alvion Properties' banks and attempting to freeze and/or confiscate Alvion Properties' assets, (v) communicating to third parties, both orally and in writing, that they—not Medley and Reynolds—own and control Alvion Properties, (vi) attempting to engage in financial

Case 3:08-cv-00866   Document 1   Filed 09/12/08   Page 38 of 46 PageID #: 38

transactions utilizing Alvion Properties' trade name and assets, and (vii) threatening to encumber (and/or encumbering) the land owned by Alvion Properties containing the coal reserves without a legal basis to do so, all to the financial benefit of Defendants and the financial detriment of Plaintiffs. Defendants' prior and ongoing wrongful actions constitute breach of contract at Tennessee common law.

**102.** In the alternative, and to the extent the Irrevocable Stock Power Forms (i.e., the irrevocable stock transfers) executed by Medley and Reynolds constitute valid contracts between Medley and Reynolds, on the one hand, and Weber, on the other hand—which they do not, for example, because they are not supported by any consideration given by Weber and were obtained by fraud—the Weber Defendants breached such contracts by using them as the basis for (i) unilaterally and without authorization establishing a new office for Alvion Properties at 5230 Hickory Park Drive, Suite A, Glen Allen, Virginia 23059, (ii) unilaterally and without authorization contacting the Virginia State Corporation Commission and removing Medley and Reynolds as officers and directors of Alvion Properties and installing Weber as President and Chairman of the Board and Raymonde Weber Secretary/Treasurer, (iii) unilaterally and without authorization changing Alvion Properties' registered agent in Virginia to Virginia Professional Services, LLC, which also is housed at 5230 Hickory Park Drive, Suite A, Glen Allen, Virginia 23059 and, on information and belief, is owned and operated by one or more Defendants, (iv) unilaterally and without authorization contacting Alvion Properties' banks and attempting to freeze and/or confiscate Alvion Properties' assets, (v) communicating to third parties, both orally and in writing, that they—not Medley and Reynolds—own and control Alvion Properties, (vi) attempting to engage in financial transactions utilizing Alvion Properties' trade name and assets, and (vii) threatening to encumber (and/or encumbering) the land owned by Alvion Properties

Case 3:08-cv-00866   Document 1   Filed 09/12/08   Page 39 of 46 PageID #: 39

containing the coal reserves without a legal basis to do so, all to the financial benefit of Defendants and the financial detriment of Plaintiffs.

**103.** The irrevocable stock transfers were executed in favor of Weber and/or his wholly-owned companies for one reason and one reason only: to structure a financial vehicle to monetize Alvion Properties' coal reserves. Once that goal was accomplished (or not accomplished), the irrevocable stock transfers were to be destroyed—not used as the basis for stealing Alvion Properties from Medley and Reynolds. Thus, and in the alternative should the irrevocable stock transfers be found to be viable and enforceable contracts between the Parties, Defendants' prior and ongoing wrongful actions as to the irrevocable stock transfers also constitute breach of contract at Tennessee common law.

## COUNT VIII

## CIVIL CONSPIRACY

## (AGAINST ALL DEFENDANTS)

**104.** The preceding factual statements and allegations are incorporated herein by reference.

**105.** Defendants (and possibly others), either working together as a combined group or in sub-combinations of two or more, affirmatively conspired to engage in the wrongful actions set forth above. Defendants, therefore, conspired to commit the wrongful actions outlined in Counts I-VII, above, all of which directly and proximately caused Plaintiffs to sustain actual and consequential damages. Defendants' wrongful actions constitute civil conspiracy at Tennessee common law.

COMPLAINT AND JURY DEMAND

40

## COUNT IX

## UNJUST ENRICHMENT

## (AGAINST ALL DEFENDANTS)

**106.** The preceding factual statements and allegations are incorporated herein by reference.

**107.** Defendants, at the very least, have been (and continue to be) unjustly enriched by (i) Alvion Properties' assets, trade name, confidential and proprietary business information (including appraisals, geology reports, mining plans, business contacts, financial information and information pertaining to Alvion Properties' financial dealings), trade secrets and goodwill, (ii) the revenues and profits generated by using such stolen and converted assets, trade name, confidential and proprietary business information (including appraisals, geology reports, mining plans, business contacts, financial information and information pertaining to Alvion Properties' financial dealings), trade secrets and goodwill, and (iii) the return on investment generated by the assets, trade name, confidential and proprietary business information (including appraisals, geology reports, mining plans, business contacts, financial information and information pertaining to Alvion Properties' financial dealings), trade secrets and goodwill described in (i) and (ii). Accordingly, Plaintiffs seek to impose a constructive trust over (and recover) all amounts by which Defendants have been unjustly enriched.

## RELIEF REQUESTED

**108.** The preceding factual statements and allegations are incorporated herein by reference.

**109. ACTUAL AND CONSEQUENTIAL DAMAGES.** As a direct and/or proximate result of Defendants' wrongful acts and practices, Plaintiffs sustained (and continue to sustain) actual

Case 3:08-cv-00866  Document 1  Filed 09/12/08  Page 41 of 46 PageID #: 41

and/or consequential damages in the form of, *inter alia,* the (i) stolen and converted Alvion Properties' assets, trade name, confidential and proprietary business information (including appraisals, geology reports, mining plans, business contacts, financial information and information pertaining to Alvion Properties' financial dealings), trade secrets and goodwill, (ii) revenues and profits generated by using such stolen and converted assets, trade name, confidential and proprietary business information (including appraisals, geology reports, mining plans, business contacts, financial information and information pertaining to Alvion Properties' financial dealings), trade secrets and goodwill (including any and all related lost opportunity costs), and (iii) return on investment generated by the assets, trade name, confidential and proprietary business information (including appraisals, geology reports, mining plans, business contacts, financial information and information pertaining to Alvion Properties' financial dealings), trade secrets and goodwill described in (i) and (ii). Alvion Properties is entitled to damages for trade secret misappropriation including actual losses, Defendants' unjust enrichment and/or a reasonable royalty pursuant to Tenn. Code §47-25-1704 (2008). All of the damages sustained by Plaintiffs were reasonably foreseeable by Defendants. Plaintiffs also are entitled to the disgorgement by Defendants of all amounts by which they have been unjustly enriched by their wrongful acts and practices.

110. **EXEMPLARY DAMAGES.** Defendants engaged in the above wrongful actions willfully and/or with malice. Accordingly, Plaintiffs are entitled to an award of exemplary damages against Defendants, not to exceed an amount of twice any award for actual losses, unjust enrichment and/or a reasonable royalty for trade secret misappropriation, pursuant to Tenn. Code §47-25-1704 (2008).

Case 3:08-cv-00866  Document 1  Filed 09/12/08  Page 42 of 46 PageID #: 42

**111.** **PUNITIVE DAMAGES.** Defendants' wrongful actions (and failure to disclose such wrongful actions) were committed intentionally, willfully, with malice and/or with reckless disregard for Plaintiffs' rights and interests. Accordingly, Plaintiffs also are entitled to an award of punitive damages against Defendants, both as punishment and to discourage such wrongful conduct in the future.

**112.** **INJUNCTIVE RELIEF.** Defendants' ongoing and continuing misappropriation, unauthorized abstraction, unauthorized use and/or unauthorized dissemination of Alvion Properties' assets, trade name, confidential and proprietary business information (including appraisals, geology reports, mining plans, business contacts, financial information and information pertaining to Alvion Properties' financial dealings), trade secrets and goodwill has caused (and will continue to cause) Plaintiffs to suffer irreparable harm in the form of, *inter alia*, wasted assets, lost financial opportunities, damage to Alvion Properties' trade name in the marketplace and damage to Plaintiffs' business reputations. Such irreparable harm will not cease unless and until enjoined by this Court. Plaintiffs, therefore, are entitled to a temporary restraining order, temporary injunction, permanent injunction and/or such other affirmative relief as appropriate pursuant to, *inter alia*, Tenn. Code §47-25-1703 (2008).

**113.** **ATTORNEYS' FEES AND EXPENSES.** Defendants' misappropriation of Alvion Properties' trade secrets has been (and continues to be) willful and malicious. As such, Plaintiffs are entitled to recover their reasonable attorneys' fees, litigation expenses and court costs pursuant to, *inter alia*, Tenn. Code §47-25-1705 (2008).

*   *   *

**WHEREFORE,** Plaintiffs request that Defendants be cited to appear and answer this lawsuit and, upon final trial or hearing, judgment be awarded against Defendants, jointly and severally, in favor of Plaintiffs, for:

(i) actual and/or consequential damages (including any and all related lost opportunity costs), as set forth above, in an amount to be determined by the trier of fact but in excess of seventy-five thousand dollars ($75,000.00) exclusive of interest and costs;

(ii) all amounts by which Defendants have been unjustly enriched;

(iii) reasonable royalties pursuant to Tenn. Code §47-25-1704 (2008);

(iv) exemplary damages pursuant to Tenn. Code §47-25-1704 (2008);

(iv) punitive damages;

(v) injunctive relief providing for all appropriate restrictions on Defendants' future conduct and/or activities;

(vi) an equitable accounting for all benefits, consideration and profits received, directly or indirectly, by any of the Defendants, including the imposition of a constructive trust, the voiding of unlawful transfers, and the disgorgement of all ill-gotten gains and profits;

(vii) pre- and post-judgment interest at the highest legal rates or at a rate equal to Defendants' return on investment, whichever is greater;

(viii) reasonable and necessary attorneys' fees and litigation expenses incurred through the trial and any appeals of this case;

(ix) costs of suit; and

(x) such other and further relief to which Plaintiffs are justly entitled.

## JURY DEMAND

Plaintiffs respectfully demand a trial by jury on all of their claims and causes of action so triable.

Respectfully submitted,

By: _____

John A. Day, Esq.
Brandon Bass, Esq.
**DAY & BLAIR, P.C.**
5300 Maryland Way, Suite 300
Brentwood, TN 37027
(615) 742-4880
(615) 742-4881 FAX
jday@dayblair.com

### ATTORNEYS-IN-CHARGE FOR PLAINTIFFS

**Of Counsel:**
Katherine F. Horvath, Esq.
**BERKELEY LAW AND TECHNOLOGY GROUP, LLP**
17933 N.W. Evergreen Parkway, Ste. 250
Beaverton, OR 97006
(503) 439-6500
(503) 439-6558 FAX
khorvath@bltg-ip.com

Richard L. Coffman, Esq.
**THE COFFMAN LAW FIRM**
First City Building
505 Orleans St., Ste. 505
Beaumont, TX 77701
(409) 833-7700
(866) 835-8250 FAX
rc@cofflaw.com

James R. Creekmore, Esq.
**THE CREEKMORE LAW FIRM, P.C.**
52 Pondview Court
Daleville, VA 24083
(540) 966-2504
(540) 966-2504 FAX
james@creekmorelaw.com

Case 3:08-cv-00866   Document 1   Filed 09/12/08   Page 45 of 46 PageID #: 45

Charles M. Allen, Esq.
**GOODMAN, ALLEN & FILETTI, PLLC**
4501 Highwoods Parkway, Ste. 210
Glen Allen, VA 23060
(804) 346-5087
(804) 346-5954 FAX
callen@goodmanallen.com