IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| **ALVION PROPERTIES, INC.,** *et al.*, ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| v. ) | **Case No. 3:08-0866** |
| ) | **Judge Trauger** |
| **BERND H. WEBER,** *et al.*, ) | |
| ) | |
| **Defendants.** ) | |
| ) | |

## MEMORANDUM

Pending before the court are three Reports and Recommendations ("R&Rs") that make recommendations as to the disposition of various pending motions in this case. The first ("First R&R") (Docket No. 151) makes a recommendation as to the disposition of the motions to dismiss filed by defendants Bernd Weber, Raymonde Weber and Claude Chauveau (Docket Nos. 34, 64, and 102). The second ("Second R&R") (Docket No. 152) makes a recommendation as to the disposition of Bernd Weber's and Chauveau's Motion to Dismiss Alvion Properties (Docket No. 129). And the third ("Third R&R") (Docket No. 153) makes a recommendation as to the disposition of the plaintiffs' Motion for Entry of Final Default Judgment [Against the Entity Defendants] (Docket No. 110) and the plaintiffs' Motion to Sever and Enter Final Default Judgment [Against the Entity Defendants] (Docket No. 113).[1]

Two sets of objections have been filed. First, the plaintiffs have filed an objection to the

---

[1] Various other motions remain pending before Judge Bryant.

1

Third R&R, arguing that Judge Bryant should have recommended granting their Motion to Sever. (Docket No. 157.) And second, defendants Bernd Weber and Chauveau have filed an objection to the First R&R, arguing that there is no subject matter jurisdiction or personal jurisdiction, and that venue is improper. (Docket No. 164.) For the reasons discussed herein, these objections, in effect, will be overruled and, with one important exception, the dispositions recommended by Judge Bryant will be accepted.

## RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff Alvion Properties is a Virginia corporation with its principal place of business in Illinois.[2] The other two plaintiffs, Shirley Medley and Harold Reynolds, are residents of Illinois and Tennessee respectively, and they each claim to own fifty percent of the stock of Alvion Properties. The plaintiffs claim that Alvion Properties owns more than 4,500 acres of coal reserves in Virginia, worth a substantial amount of money. Medley and Reynolds have long been interested in "monetizing" these coal reserves.[3]

In 2005, Medley and Reynolds became acquainted with defendant Bernd Weber, who was introduced to them as a successful and experienced international financier (Mr. Weber is German and now lives in Canada) who could assist Medley and Reynolds with their goal of monetization. After initial discussions, Mr. Weber signed a confidentiality and non-disclosure agreement with the plaintiffs in June 2005, at which point the plaintiffs began divulging

---

[2] Unless otherwise stated, the facts are drawn from Judge Bryant's R&Rs and the plaintiffs' Amended Complaint. (Docket Nos. 26, 151-153.)

[3] The parties never fully explain what it means to "monetize" the coal reserves, but Webster's Dictionary defines the term as "to convert into currency." 2nd Edition at 1241. Therefore, the court will presume that the aim was to turn the coal reserves into liquid cash.

confidential and proprietary information to Mr. Weber about the plaintiffs' assets, finances, financial dealings and other related information.

Over the course of three days in August 2005, Medley and Reynolds met with Mr. Weber in Nashville, Tennessee. During these meetings, Mr. Weber represented that, through his company American Gulf Finance Corporation, he possessed the requisite financial contacts and knowledge to construct a financial vehicle that would effectively monetize Alvion Properties's coal reserves. As a result of the representations made at the August 2005 meetings in Nashville, the plaintiffs retained Mr. Weber (through American Gulf) as a consultant to help them construct the financial vehicle. At an August 18, 2005 meeting of the board of Alvion Properties in Nashville, Mr. Weber convinced the plaintiffs that, in order to carry out the goals stated above, Mr. Weber would need a resolution from the board, granting substantial power and authority to American Gulf to act on Alvion Properties's behalf, along with a temporary assignment of the coal reserves. Based on Mr. Weber's representations, the board passed the resolution.

After the August 2005 meetings, Mr. Weber was appointed Director of Finance and, later, Chief Financial Officer of Alvion Properties. On numerous occasions between 2005 and 2008, the plaintiffs met with Mr. Weber in Nashville to discuss the progress of the monetization project, and, during these meetings and on other occasions, Mr. Weber became privy to increasing amounts of confidential and proprietary information about the plaintiffs, all of which Mr. Weber claimed that he needed in order to complete the monetization project.

In late 2006, apparently without the plaintiffs' knowledge, Mr. Weber approached the Melland Group, which is a financial consulting company based in Oregon, about using that

company's intellectual property to assist with the monetization project. The Chief Information Officer of the Melland Group, at that time, was defendant Chauveau. The plaintiffs allege that, through a series of meetings with Chauveau and other individuals associated with the Melland Group in the early part of 2007, Mr. Weber first concocted the scheme to steal the coal reserves from the plaintiffs. During this same time period, the plaintiffs allege that Mr. Weber continued to deceive the plaintiffs into thinking that he needed additional authority from the Alvion Properties board in order to construct the financial vehicle. Most notably, during meetings in Nashville in the summer of 2007 and in subsequent telephone conversations, Mr. Weber began to push for the plaintiffs to irrevocably transfer to Mr. Weber (through American Gulf) the right to transfer, sell or assign Alvion Properties's stock. The plaintiffs eventually agreed to grant these stock transfer rights to Mr. Weber in September 2007.

The plaintiffs allege that, once their scheme was implemented, Mr. Weber and Chauveau used a group of corporate entities that they controlled (and the knowledge and authority that Mr. Weber had acquired from the plaintiffs) to perform a series of complex, unauthorized and fraudulent financial transactions to convert the coal reserves of Alvion Properties to themselves. In November 2007, for instance, Mr. Weber created a wholly-owned corporation, Alvion Partners, which, as of December 2007, was representing that it owned 100 percent of the stock of Alvion Properties.

In April 2008, the relationship between the plaintiffs and Mr. Weber imploded, as the plaintiffs became aware that Mr. Weber had been engaged in detailed negotiations and had entered into agreements with individuals at Melland without the plaintiffs' knowledge. In May

4

2008, the Alvion Properties board removed Mr. Weber as a director, revoked his authority to act on behalf of the company, and demanded the return of the company's proprietary information. In August 2008, Mr. Weber (through American Gulf) sent notice to the plaintiffs that he had exercised the stock transfer rights that he had previously acquired and that, now, 100 percent of Alvion Properties was owned by Alvion Partners, a company, which, as noted above, is solely owned by Mr. Weber. According to the plaintiffs, Mr. Weber, among other improper maneuvers, has used his purported control over Alvion Properties to nullify the plaintiffs' stock in the company, establish a new office, remove the plaintiffs as officers and directors and to establish himself as President and his wife, defendant Raymonde Weber, as Secretary/Treasurer.

On September 12, 2008, the plaintiffs filed their initial Complaint in this matter, asserting several state law causes of action against the Webers, Chauveau, various entities controlled by Mr. Weber and Chauveau, and George Howard, who used to be a consultant for the plaintiffs and, who, the plaintiffs claim, became involved in the conspiracy to wrest control of Alvion Properties from the plaintiffs. (Docket No. 1.) While the initial Complaint was premised on diversity jurisdiction, there was not the required "complete diversity" of parties because Howard and Reynolds are both from Tennessee. Therefore, on October 20, 2008, the same day that Howard filed a Motion to Dismiss for lack of jurisdiction (Docket No. 28), the plaintiffs filed an Amended Complaint that asserted a federal cause of action under the Lanham Act. (Docket No. 26.) On January 26, 2009, the plaintiffs voluntarily dismissed Howard as a defendant in this case, without prejudice. (Docket No. 99.) The plaintiffs have also voluntarily dismissed several other corporate defendants, or "Entity Defendants."

5

The remaining "Entity Defendants," that is, American Gulf, Alvion Partners, AGF Realty Solutions, and TimeData Holdings, have not entered an appearance in this matter, and they are not represented by counsel. (Docket No. 108.) Default has been entered against these defendants. (*Id.*) While Mr. Weber and Chauveau appear to control these companies, Mr. Weber and Chauveau are proceeding *pro se*, and they are, therefore, prohibited from attempting to represent these companies in this matter. (*See* Docket Nos. 53 & 115.)

## ANALYSIS

While there are many issues still outstanding in this complicated and contentious litigation, the issues presently before the court, as will be discussed below, are relatively narrow. They are: (1) whether Judge Bryant correctly concluded that jurisdiction and venue are proper and (2) whether Judge Bryant properly concluded that the claims against the Entity Defendants should not be severed. Also, at the conclusion of the opinion, the court will briefly address why it will deny the plaintiff's Motion for Entry of Final Default Judgment [Against the Entity Defendants], even though no objection has been made to the R&R recommending that this motion be granted.

**I.  Standard of Review**

Under Federal Rule of Civil Procedure 72(b) and 28 U.S.C. § 636(b)(1), the court is required to make a *de novo* determination of any part of the Magistrate Judge's R&R to which specific objection has been made. The district judge may accept, reject, or modify the recommended disposition, receive further evidence, or return the matter to the magistrate judge with instructions. Fed. R. Civ. P. 72(b)(3).

## II. Jurisdiction and Venue

### A. Subject Matter Jurisdiction

As Judge Bryant noted in the First R&R, the Webers and Chauveau have all raised lack of subject matter jurisdiction as grounds for dismissal. (Docket No. 151 at 5.) These defendants asserted that there is no diversity jurisdiction because Howard and Reynolds are Tennesseans, and that there is no federal question jurisdiction because the plaintiffs fail to state a claim under the Lanham Act. (*Id.* at 5-6.) Judge Bryant concluded that there was diversity jurisdiction over these defendants because Howard had been dismissed and the "dismissal of a nondiverse defendant has been held to be a method of curing a jurisdictional defect that is an exception to the time of filing rule." (*Id.* at 6 citing *Grupo Dataflux v. Altas Global Group, LP*, 541 U.S. 567, 572 (2004)). Therefore, viewing the parties as presently diverse, Judge Bryant concluded that there is subject matter jurisdiction, and he did not reach the issue of federal question jurisdiction.

In their objection, Mr. Weber and Chauveau argue that, because the Amended Complaint asserts jurisdiction on the basis of a federal question, Judge Bryant was required to evaluate jurisdiction on that basis. (Docket No. 164 Ex. 1 at 2.) These defendants strenuously argue that this court must now hold an evidentiary hearing on the issue of whether the Amended Complaint states a proper claim under the Lanham Act. (*Id.* at 3.)

The court agrees with the defendants – to a point. As the initial Complaint is generally considered a "dead letter" once the Amended Complaint is filed, the Magistrate Judge should have evaluated jurisdiction on the basis stated in the Amended Complaint, which is federal question. *See Bituminous Cas. Corp. v. Tindle Enters.*, 2009 WL 2843375, *4 (W.D. Tenn. Aug.

7

31, 2009). That said, properly pled federal question jurisdiction supports a lawsuit in federal court, even if that jurisdiction is only first identified in an Amended Complaint, after the plaintiff's initial complaint incorrectly pled jurisdiction on the basis of diversity. *Musson Theatrical, Inc. v. Fed Express Corp*, 89 F.3d 1244, 1254 (6th Cir. 1996) (noting that "an amendment that changes the jurisdictional basis of an action will relate back to the date of the original complaint if the factual situation alleged otherwise remains unaltered"); *Connectu v. Zuckerberg*, 522 F.3d 82, 92-93 (1st Cir. 2008)(permitting the "legitimate shifting of the jurisdictional underpinnings of an action" and noting that "no court has ever read the time-of-filing rule to bar a plaintiff from switching jurisdictional horses before any jurisdictional issue has been raised, abandoning a claimed entitlement to diversity jurisdiction, and substituting a claimed entitlement to federal question jurisdiction.")

In their Amended Complaint, the plaintiffs assert a claim under the Lanham Act, specifically 15 U.S.C. § 1125(a), which states, in relevant part, that "any person who ... uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which ... is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person ... shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act." Here, the plaintiffs have alleged that the defendants have represented that the plaintiffs' coal reserves and the plaintiffs' efforts to monetize those reserves

8

are owned by the defendants, and this has caused confusion in the marketplace, particularly because the defendants are using the name Alvion Partners in conjunction with these efforts. (Docket No. 26 at 42-43.)

In their initial motions to dismiss and in their objections to Judge Bryant's First R&R, the defendants have failed to offer any reason to believe that the plaintiffs have failed to state a valid claim under the Lanham Act. Rather, in their Motion to Dismiss, Mr. Weber and Chauveau simply provide a brief and broad description of Lanham Act and trademark law and then conclusively assert that the plaintiffs do not state a claim under that act. (*See* Docket No. 102.)

At this stage, the plaintiffs' need only to state a plausible claim for relief, and no evidentiary hearing to determine whether the plaintiffs have properly stated a Lanham Act claim is required. *See Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009). Through the defendants' failure to offer any substantive basis for dismissal of the Lanham Act claim and through the plaintiffs' allegations that the defendants set up a company with a similar name to the plaintiffs' company and their allegations that the defendants, using that similarly named company, have been passing off the plaintiffs' property as their own, the plaintiffs have sufficiently stated a claim under the Lanham Act at this point in the litigation. Therefore, the court concludes that there is subject matter jurisdiction over the defendants here, based on the federal question raised by the Amended Complaint.

### B. Personal Jurisdiction and Venue

Rejecting an additional argument raised in his motion to dismiss, Judge Bryant concluded

9

that there is personal jurisdiction over Mr. Weber in Tennessee. (*See* Docket No. 151 at 8.)[4] Judge Bryant correctly analyzed that the issue of whether this court may exercise personal jurisdiction over Mr. Weber depends on the specific limitations of Tennessee's long-arm statute and on the constitutional principles of due process. *Bridgeport Music, Inc. v. Still N The Water Publishing*, 327 F.3d 472, 477 (6th Cir. 2003). Tennessee's long-arm statute has been consistently construed to extend to the limits of federal due process, and, therefore, the two inquiries are merged and the court need only determine whether exercising personal jurisdiction over the defendant is consistent with federal due process requirements. *Id.*

In order for due process to permit the exercise of personal jurisdiction over a non-resident defendant, that defendant must have "certain minimum contacts with [the forum] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Youn v. Track, Inc.*, 324 F.3d 409, 417-18 (6th Cir. 2003) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). The Supreme Court has identified "general" jurisdiction and "specific" jurisdiction as distinct bases for personal jurisdiction, and a demonstration of the contacts necessary for either basis is sufficient to establish personal jurisdiction. *Id.*

Specific jurisdiction exists when a state exercises personal jurisdiction over a defendant in a suit arising out of or related to the defendant's contacts with the forum. *Id.* General

---

[4] Despite Mr. Weber's unsupported objection to the contrary, Judge Bryant's analysis of the personal jurisdiction issue is not invalid because he was relying on the notion that subject matter jurisdiction was premised on diversity grounds. (Docket No. 164 Ex. 1 at 9.) The analysis here would be the same whether subject matter jurisdiction is premised on diversity or federal questions grounds. *See Bridgeport Music, Inc. v. Still N the Water Publishing.*, 327 F.3d 472, 477 (6th Cir. 2003).

10

Case 3:08-cv-00866   Document 166   Filed 09/23/09   Page 10 of 18 PageID #: 1176

jurisdiction, on the other hand, exists when a defendant's contacts with the forum are "substantial" and "continuous and systematic." *Id.* When personal jurisdiction is based on general jurisdiction, a state may exercise jurisdiction over a defendant, even if the suit does not arise out of the defendant's contacts with the state. *Id.*

Judge Bryant correctly concluded that an analysis of whether there is specific – as opposed to general – personal jurisdiction over Mr. Weber was called for by the allegations in the Amended Complaint. (Docket No. 151 at 7.) In *Southern Machine Co. v. Mohasco Industries, Inc.*, the Sixth Circuit established a three-part test for determining whether the exercise of specific jurisdiction was consistent with the principles of due process. "First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequence caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable." 401 F.2d 374, 381 (6th Cir. 1968).

In the First R&R, Judge Bryant concluded that the allegations in the Amended Complaint were sufficient to demonstrate specific personal jurisdiction over Mr. Weber. (Docket No. 151 at 7-8.) Judge Bryant focused on the fact that the Amended Complaint alleged that Mr. Weber repeatedly traveled to Nashville in order to meet with the plaintiffs and in order to make the representations that are at the heart of the dispute in this case. (*Id.* at 7-8.) Judge Bryant concluded that these allegations demonstrated that Mr. Weber had "purposefully availed himself of the privilege of acting within Tennessee sufficiently to support personal jurisdiction over him

11

in this case."[5]  (*Id.* at 8.)

In objecting to Judge Bryant's conclusions on the personal jurisdiction issue, Mr. Weber argues that a few meetings in Nashville "purely for the convenience of the plaintiffs" are not sufficient to support general personal jurisdiction over him.  (Docket No. 164 Ex. 1 at 9-11.) The court does not disagree, but, as noted above, Judge Bryant rested his conclusions as to personal jurisdiction over Mr. Weber on specific personal jurisdiction.

Mr. Weber also objects that there is no specific personal jurisdiction over him, again arguing that he has absolutely no connection to Tennessee other than the few meetings that he had with the plaintiffs in Nashville.  (*Id.* at 13.)  Mr. Weber argues that his contact with Tennessee was so isolated and narrow that it would not be reasonable to hale him into court in this state.[6]

---

[5] As to Ms. Weber, Judge Bryant concluded that, while "the Amended Complaint does not allege that defendant Raymonde Weber was physically present in Tennessee at any pertinent time, [] it does assert that she conspired with her husband ... to engage in the wrongful actions that caused damage to plaintiffs."  (Docket No. 151 at 8.)  Therefore, Judge Bryant concluded that personal jurisdiction could be exercised over Ms. Weber under the "conspiracy" theory of jurisdiction.  (*Id.* at 9.)  Ms. Weber did not file an objection to the R&R.

[6] The defendant argues that a five-part test identified in *Humphreys v. Selvey* should guide the court's analysis.  (Docket No. 164 Ex. 1 at 12 citing 2004 WL 948788 (Tenn. Ct. App. Nov. 15, 2004)). In *Humphreys*, the Tennessee Court of Appeals identified five factors that courts generally consider when analyzing whether jurisdiction is appropriate, that is, "(1) the quantity of the contacts between the defendant and the forum state; (2) the nature and quality of those contacts; (3) the relationship between those contacts and the cause of action; (4) the interest of the forum state in adjudicating the dispute; and (5) the convenience of the forum state to the parties." *Id.* at *6.  While there is no indication that the result would be any different under this test, *Humphreys* did not discuss general versus specific personal jurisdiction, a distinction that is crucial here, and, therefore, *Humphreys* is not the "perfect prototype" that the defendants claim it to be.  *Id.*

12

A review of the three-part specific jurisdiction test demonstrates the soundness of Judge Bryant's conclusions here. First, there is no dispute that Mr. Weber repeatedly traveled to Nashville to conduct business with the plaintiffs and, while in Nashville, he made representations to the plaintiffs that caused many of the crucial events in this case, thereby "purposefully availing himself of the privilege of acting in the forum state [and] causing a consequence in the forum state." Second, the causes of action clearly "arise from the defendant's activities" in Nashville; it is clear from the Amended Complaint that, without the representations Mr. Weber made in Nashville, the events giving rise to the Amended Complaint would not have taken place. Finally, "the acts of the defendant ... have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable." While there are other locations where relevant events occurred, a review of the Amended Complaint indicates that many, if not most, of the relevant events took place in Nashville, giving Tennessee a vested interest in this litigation and certainly making the exercise of personal jurisdiction over Mr. Weber here reasonable. Therefore, the court concludes that Judge Bryant correctly ruled that there is personal jurisdiction over Mr. Weber in this case.

### C. Venue

In the First R&R, Judge Bryant concluded that venue is proper in this case because the general venue statute for federal district courts states that venue is appropriate in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred." (Docket No. 151 at 10 citing 28 U.S.C. § 1391(b)). Judge Bryant concluded that, "in light of the allegations in the Amended Complaint describing multiple meetings between plaintiffs and

13

defendant Bernd Weber in Nashville, Tennessee ... a substantial part of the events ... giving rise to the claim occurred in the district." (Docket No. 151 at 10)(internal citation omitted). In his objection to this conclusion, Mr. Weber relies on his previous arguments, discussed above. (Docket No. 164 Ex. 1 at 15.) As discussed above, the allegations in the Amended Complaint clearly demonstrate that, while not every relevant event occurred in this district, a substantial portion of them did. The objections based on venue will be overruled.

The recommendations of Judge Bryant will stand and the Motions to Dismiss (Docket Nos. 34, 64, and 103) will be denied.[7]

## III. Motion to Sever and Motion for Entry of Final Default Judgment

In the Third R&R, Judge Bryant ruled on the plaintiffs' Motion for Entry of Final Default Judgment [Against the Entity Defendants] (Docket No. 110) and the plaintiffs' Motion to Sever and Enter Final Default Judgment [Against the Entity Defendants] (Docket No. 113). Judge Bryant noted that the Clerk of Court had previously entered default against the remaining Entity Defendants (Docket No. 108), and as "none of these four Entity Defendants have appeared or

---

[7] In the opening section of their R&R objection, Mr. Weber and Chauveau allude to the findings in the Second and Third R&Rs as "clearly flawed," and they also object to the Magistrate Judge's ordering them to furnish initial disclosures by September 15, 2009. (Docket No. 164 at 2.) In order for the court to consider objections to the R&Rs, the plaintiffs must make specific, timely objections. Simply alluding to the R&Rs as "clearly flawed" does not constitute such an objection. Also, along with the objection filing, Mr. Weber and Chauveau filed a series of documents, including a lengthy affidavit from Mr. Weber defending his conduct in regard to the plaintiffs in this case. (Docket No. 163 Ex. 1.) By and large, this material does not bear on the jurisdictional and venue issues that are presently before the court, and, to the extent the material bears on the personal jurisdiction issues, the material simply covers old ground. (*See* Docket No. 163 Ex. 1 at 10.)

14

otherwise defended this case, and default has been entered against them ... the plaintiffs' motion for default judgment should be entered in accord with plaintiffs' proposed final default judgment." (Docket No. 153 at 1-2.) Judge Bryant noted, however, that "plaintiffs have neither stated a ground for their motion to sever ... nor filed a memorandum of law as required" and, therefore, Judge Bryant recommended denying the Motion to Sever. (*Id.* at 2.)

### A. Severance

In their objection to the Third R&R, the plaintiffs argue that Judge Bryant should have recommended severing the action against the Entity Defendants, because that would "expedite the finality of the anticipated judgment against the Entity Defendants while [the plaintiffs] continue to litigate their claims against the remaining individual defendants." (Docket No. 157 at 2.) The remainder of the plaintiffs' objection filing is a brief, general discussion of severance under Federal Rule of Civil Procedure 21, largely focused on the fact that severance of one suit into two suits renders those suits independent and discrete such that an "appeal from a judgment on a validly severed single claim may be timely taken as of right notwithstanding the pendency of the remaining claims or counterclaims." (*Id.* at 2-3 citing *Spencer, White & Prentis, Inc. v. Pfizer, Inc.*, 498 F.2d 358, 361 (2nd Cir. 1974)).

Federal Rule of Civil Procedure 21 simply establishes that "the court may [] sever any claim against a party." Fed. R. Civ. P. 21. Plainly, the permissive language of Rule 21 permits the district court broad discretion in determining whether or not actions should be severed. *See Payne v. Corrections Corp. of Am.*, 1999 WL 970295, *1 (6th Cir. Oct. 15, 1999). That said, Rule 21 severance is not the norm – the propriety of severance under this rule usually arises in

15

the context of misjoinder of parties, which is not at issue here. *See America's Collectibles Network, Inc. v. Chase Paymentech Solutions, LLC*, 2008 WL 4546251, *3 (E.D. Tenn. Sept. 24, 2008). Outside of the context of misjoinder, Rule 21 severance may also be called for where failure to sever would place an undue burden on the parties, impose unnecessary expense, or would risk jury confusion at trial. *Id.*

Here, despite two opportunities, the plaintiffs can muster no greater basis for severance than that it would "expedite the finality of the anticipated judgment" against the Entity Defendants. This statement is vague, and the plaintiffs continue to fail to explain why the ends of justice are served by severance. It is telling that Judge Bryant, who has been charged with the case management of this matter and who could have ruled in favor of severance at any time, elected not to do so. As severance is a matter within the discretion of the district court, there is nothing that prevents the plaintiffs from renewing their motion to sever before Judge Bryant, clearly indicating why severance is in the interests of justice in this case. For the moment, however, the plaintiffs' objections will be overruled.

### B. Entry of Final Judgment

As noted above, in conjunction with their Motion for Entry of Final Default Judgment [Against the Entity Defendants], the plaintiffs have submitted a proposed final default judgment, which Judge Bryant has recommended be entered. (Docket No. 110 Ex. 7; Docket No. 153 at 2.) The court will not enter this judgment, and, therefore, will deny the plaintiffs' motion.[8]

---

[8]A district court may reject a Magistrate Judge's recommendation, even if no objection is made to the recommendation, as it "is the district judge who determines whether to reject or

16

Generally, although not completely, consistent with the injunctive relief sought in the Amended Complaint, the proposed final judgment would impose a permanent mandatory injunction on the remaining Entity Defendants and their "officers, directors, employees and/or shareholders/owners" in nine different areas, including requiring that the Entity Defendants and individuals associated with the Entity Defendants destroy "stock certificates evidencing [] ownership of Alvion Properties" and prohibiting the Entity Defendants and individuals associated with the Entity Defendants from taking "any action, either directly or indirectly, by, through and/or on behalf of Alvion Properties, Inc., including representing to other persons, entities and/or governmental agencies that they own, control, represent and/or are affiliated in any way with Alvion Properties, Inc." (Docket No. 110 Ex. 7 at 2.)

Plainly, this injunction would impose broad relief, would not preserve the status quo and would operate, essentially, as a summary judgment against the Entity Defendants, providing the plaintiffs with much of the relief that they seek in this case. Broad, summary judgment type relief should not be imposed on a party through a default judgment simply because that party has failed to participate in the litigation. *See Stough v. Mayville Cmty Schs.*, 138 F.3d 612, 614 (6th Cir. 1998); Fed. R.. Civ. P. 55(b)(providing the court with broad authority to investigate the merits of a claim before entering a default judgment).

Moreover, the proposed judgment is so broad that it would clearly dictate the conduct of

---

adopt a magistrate judge's recommendation and who is authorized to make a fresh determination even when no objection was made." *Palmer v. Bagley*, 2009 WL 1528503, *11 (6th Cir. May 29, 2009).

the individual defendants in this case, before those defendants have had a full and fair opportunity to litigate these claims and offer defenses. In addition to this being unfair to the individual defendants in this case, the restrictions imposed by the proposed judgment would create substantial confusion as to the rights and obligations of the individual defendants as this case proceeds, particularly if the individual defendants prevail on the merits. For all of these reasons, the plaintiffs' Motion for Entry of Final Default Judgment [Against the Entity Defendants] will be denied.[9]

## CONCLUSION

For the reasons discussed herein, the various objections raised to Judge Bryant's R&Rs in this matter will be overruled, and Judge Bryant's recommended dispositions will, with one important exception, be accepted.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge

---

[9] Certainly the court would entertain a more circumscribed proposed judgment against the Entity Defendants that does not foreclose the individual defendants who are participating in this case from presenting their defenses.